1   MARIO N. ALIOTO, ESQ. (56433)
    LAUREN C. RUSSELL, ESQ. (241151)
2   TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
    2280 Union Street
3   San Francisco, CA 94123
4   Telephone: (415) 563-7200
    Facsimile: (415) 346-0679
5   malioto@tatp.com
    laurenrussell@tatp.com
6

    ORIGINAL
    FILED

    DEC 1 9 2007

7   SHERMAN KASSOF, ESQ. (66383)
    LAW OFFICES OF SHERMAN KASSOF
8   954 Risa Road, Suite B
    Lafayette, CA 94549
9   Telephone: (510) 652 2554
    Facsimile: (510) 652 9308
10  heevay@att.net

    RICHARD W. WIEKING
    CLERK, U.S. DISTRICT COURT
    NORTHERN DISTRICT OF CALIFORNIA

11  Attorneys for Plaintiffs

12                    UNITED STATES DISTRICT COURT

13                    NORTHERN DISTRICT OF CALIFORNIA

14

15  MARTIN KAUFMAN; IREATHA DIANE      )  Case No.
    MITCHELL; ROSEMARY SENGER; AND,    )
16  LEMUEL SCHENCK, on behalf of themselves)
    and all others similarly situated,   )  CLASS ACTION COMPLAINT
17
                                         )
18              Plaintiffs,              )
    vs.                                  )
19                                       )  JURY TRIAL DEMANDED
                                         )
    AIR NEW ZEALAND, LTD.; ALL NIPPON   )
20  AIRWAYS CO., LTD.; CATHAY PACIFIC   )
    AIRWAYS; CHINA AIRLINES, LTD.; EVA  )
21  AIRWAYS CORP.; JAPAN AIRLINES       )
    CORP.; MALAYSIA AIRLINES;           )
22  NORTHWEST AIRLINES CORP.; QANTAS    )
23  AIRWAYS, LTD.; SINGAPORE AIRLINES,  )
    LTD.; THAI AIRWAYS INTERNATIONAL    )
24  PUBLIC COMPANY, LTD.; and UNITED    )
    AIRLINES,                           )
25                                      )
26              Defendants.             )

27

28

                                    1
                          **CLASS ACTION COMPLAINT**

## CLASS ACTION COMPLAINT

Plaintiffs Martin Kaufman ("Kaufman"), Ireatha Diane Mitchell ("Mitchell"), Rosemary Senger ("Senger"), and Lemuel Schenck ("Schenck") on behalf of themselves and all others similarly situated in the United States, bring this action for treble damages and injunctive relief under the federal antitrust laws of the United States against the Defendants named herein, demanding trial by jury, and complaining and alleging as follows:

## NATURE OF THE CASE

1.     This lawsuit is brought as a class action on behalf of individuals and entities that purchased airline tickets for long haul passenger transpacific flights to and from the United States ("Air Passenger Services") from Defendants, their predecessors, or their controlled subsidiaries and affiliates during the period beginning no later than January 1, 2004 and continuing through the present (the "Class Period"). Plaintiffs allege that during the Class Period the Defendants conspired to fix, raise, maintain or stabilize surcharges for fuel ("Fuel Surcharges") in airline passenger transport fees assessed to individuals or companies seeking transport via air on behalf of themselves or others ("Airline Customers"). Plaintiffs allege that the Defendants have acted in concert to exact from Plaintiffs and other customers similarly situated, often identical Fuel Surcharges on top of the rates they normally charge for long-haul flights.

2.     Defendants have ostensibly imposed Fuel Surcharges to defray the increased costs they have incurred for jet fuel. However, instead of individually and competitively negotiating the Fuel Surcharges with their customers, Defendants have conspired to fix, implement and maintain the level of Fuel Surcharges. They have used their cartel to increase Fuel Surcharges in lockstep, in amounts that exceed Defendants' actual fuel costs and generate substantial profits. Because of Defendants' unlawful conduct, Plaintiffs and other Class Members paid artificially inflated prices for Air Passenger Services and have suffered antitrust injury to their business or property.

3.     At all relevant times herein, Defendants were airlines that conducted and sold Air Passenger Services, and charged fixed Fuel Surcharges on that transport, to Airline Customers in

the United States and throughout the world, including but not limited to flights to and from Los Angeles and San Francisco, California. Los Angeles International Airport ("LAX") and San Francisco International Airport ("SFO") are considered the international U.S. gateways to Asian and Pacific countries. The U.S. Department of Transportation reported that in 2005 LAX and SFO were ranked the top U.S. passenger gateways to the world in scheduled passenger service. That year, LAX and SFO had 24.6 million gateway passengers, with the foreign share of the passengers at an average of 67%.

4.    Plaintiffs allege that Defendants' cartel and concerted anticompetitive conduct is in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits restraints of trade. Plaintiffs seek treble damages and injunctive relief on behalf of themselves and all other similarly situated purchasers of Air Passenger Services during the Class Period.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over this action based on Section 4 of the Clayton Act, 15 U.S.C. §15, which confers to the United States district courts jurisdiction over actions seeking damages and costs, including reasonable attorneys' fees, for violations of the Sherman Act. Section 16 of the Clayton Act, 15 U.S.C. §16, is the basis for this Court's jurisdiction over Plaintiffs' claim for injunctive relief. This Court also has jurisdiction under 28 U.S.C. §1331, which vests the district courts with jurisdiction over actions, such as this one, which arise under federal law, and under 28 U.S.C. §1337, which grants the district courts jurisdiction under the federal antitrust laws.

6.    This Court has personal jurisdiction over Defendants because they systematically and continually conduct business in the United States, including marketing, advertising, and sales directed to residents here.

7.    Venue is laid in this District pursuant to 28 U.S.C. § 1391. Venue is proper in this judicial district because during the Class Period one or more of the Defendants resided, transacted business, was found, or had agents in, this district, and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, and a substantial portion of

1  the affected portion of the interstate trade and commerce described below has been carried out in
2  this district.

3  ## DEFINITIONS

4  8.      As used herein, the term "Air Passenger Services" includes airline tickets
5  purchased for international air transportation services containing at least one transpacific flight
6  segment.

7  9.      The "Class Period" or "relevant period" means the period from no later than
8  January 1, 2004 and continuing through the present.

9  10.     "Person" means any individual, partnership, corporation, association, or other
10  business or legal entity.

11  ## PLAINTIFFS

12  11.     Plaintiff Martin Kaufman ("Kaufman") is a California resident. During the
13  relevant period, Kaufman purchased Air Passenger Services directly from one or more of the
14  Defendants or their co-conspirators and has been injured by reason of the antitrust violations
15  alleged in this Complaint.

16  12.     Plaintiff Ireatha Diane Mitchell ("Mitchell") is a California resident. During the
17  relevant period, Mitchell purchased Air Passenger Services directly from one or more of the
18  Defendants or their co-conspirators and has been injured by reason of the antitrust violations
19  alleged in this Complaint.

20  13.     Plaintiff Rosemary Senger ("Senger") is a Louisiana resident. During the relevant
21  period, Senger purchased Air Passenger Services directly from one or more of the Defendants or
22  their co-conspirators and has been injured by reason of the antitrust violations alleged in this
23  Complaint.

24  14.     Plaintiff Lemuel Schenck ("Schenck") is a Louisiana resident. During the
25  relevant period, Schenck purchased Air Passenger Services directly from one or more of the
26  Defendants or their co-conspirators and has been injured by reason of the antitrust violations
27  alleged in this Complaint.

28  //

**4**
**CLASS ACTION COMPLAINT**

1

## DEFENDANTS

2      15.    Defendant Air New Zealand, Ltd. ("Air New Zealand") is a New Zealand

3   company headquartered at Level 19, Quay Tower, 29 Customs St. West, Auckland, 1020, New

4   Zealand. Air New Zealand is considered the South Pacific's largest international carrier with a

5   focus on Australia and the South Pacific. The airline provides service within New Zealand, as

6   well as to and from Australia, the South Pacific, Asia, North America and the United Kingdom.

7   Air New Zealand operates daily non-stop flights from San Francisco to Auckland. During the

8   Class Period, Air New Zealand sold Air Passenger Services throughout the world including to

9   customers in the United States.

10      16.    Defendant All Nippon Airways Co., Ltd. ("All Nippon") is a Japanese company

11   headquartered in Shiodome-City Center, 1-5-2, Higashi-Shimbashi, Minator-Ku, Tokyo, 105-

12   7133, Japan. All Nippon is Japan's second largest domestic and international airlines after Japan

13   Airlines Corporation, operating 49 domestic and 22 international routes. During the Class

14   Period, All Nippon sold Air Passenger Services throughout the world, including to customers in

15   the United States.

16      17.    Defendant Cathay Pacific Airways ("Cathay Pacific") is a Hong Kong-based

17   company with its principal place of business at 9 Connaught Road, Central Swirel Housepox 1

18   GPO, Hong Kong K3. Cathay Pacific has airport locations throughout the world, including the

19   United States, and specifically at SFO and LAX. During the Class Period, Cathay Pacific sold

20   Air Passenger Services throughout the world, including to customers in the United States.

21      18.    Defendant China Airlines, Ltd. ("China Air") is a Taiwanese company

22   headquartered at 131, Sec. 3, Nanking E Rd., Taipei, Taiwan. China Air was the first Asian

23   carrier to fly the transpacific route between Taiwan and the United States. It services 68 cities in

24   25 countries. During the Class Period, China Air sold Air Passenger Services throughout the

25   world, including to customers in the United States.

26      19.    Defendant EVA Airways Corporation ("EVA Air") is a Taiwanese company

27   headquartered at 117, Sec. 2, Chang-An E. Rd., Taipei, 104, Taiwan. EVA Air is the largest

28   privately owned Taiwanese airline. It operates passenger service to international destinations in

**5**
**CLASS ACTION COMPLAINT**

1  Asia, Australia, New Zealand, Europe and North America. During the Class Period, EVA Air
2  sold Air Passenger Services throughout the world, including to customers in the United States.

3  20.    Defendant Japan Airlines Corporation ("Japan Air") is a Japanese company
4  headquartered at 4-11 Higashi-shinagawa 2 chome, Shinagawa-Ku, Tokyo, 140-8638, Japan.
5  Japan Air was created in 2002 through the merger of Japan Airlines and Japan Air Systems.
6  Japan Air is one of the largest air carriers in the world and the largest airline operator in Asia.
7  During the Class Period, Japan Air sold Air Passenger Services throughout the world, including
8  to customers in the United States.

9  21.    Defendant Malaysia Airlines is a Malaysian corporation with its principal place
10  of business located at MAS Complex A, Sultan Abdul Azia Shah Airport, 47200 Suband,
11  Selangor Darui Ehsan, Malaysia. During the Class Period, Malaysia Airlines sold Air Passenger
12  Services throughout the world, including to customers in the United States.

13  22.    Defendant Northwest Airlines Corporation ("Northwest") is a Delaware
14  corporation headquartered at 2700 Lone Oak Pkwy, Eagan, Minnesota 55121. Northwest flies to
15  more than 240 cities in North America, Asia, and Europe. It operates more than 200 non-stop
16  flights between the United States and Asia each week. During the Class Period, Northwest sold
17  Air Passenger Services throughout the world, including to customers in the United States.

18  23.    Defendant Qantas Airways, Ltd. ("Qantas") is an Australian company
19  headquartered at 203 Coward Street, Mascot, MSW 2020, Australia. Qantas is the largest
20  domestic and international carrier in Australia. During the Class Period, Qantas sold Air
21  Passenger Services throughout the world, including to customers in the United States.

22  24.    Defendant Singapore Airlines, Ltd. ("Singapore Air") is a Singaporean company
23  headquartered at Airline House, 25 Airline Road, Singapore 819829. Singapore Air is one of
24  Asia's leading airlines. During the Class Period, Singapore Air sold Air Passenger Services
25  throughout the world, including to customers in the United States.

26  25.    Defendant Thai Airways International Public Company, Ltd. ("Thai Air") is a
27  Thai company headquartered at 89 Vibhavadi Rangsit Road, Bangkok, 10900, Thailand. Thai
28

1  Air flies to 74 destinations in 34 countries on four continents. During the Class Period, Thai Air

2  sold Air Passenger Services throughout the world, including to customers in the United States.

3  26.      Defendant United Airlines ("United") is a Delaware corporation with its principal

4  place of business located at 77 W. Wacker, Chicago, IL 60601. United is one of the largest

5  passenger airlines in the world with more than 3,600 flights a day to more than two hundred

6  destinations. United is the largest employer in San Mateo County, California, which is located in

7  this district. During the Class Period, United sold Air Passenger Services throughout the world,

8  including to customers in the United States.

9  27.      Defendants identified above are sometimes collectively referred to herein as the

10  "Air Passenger Carriers."

11  ## DEFENDANTS AND CO-CONSPIRATORS

12  28.      Various other air passenger carriers, trade associations, persons and/or entities,

13  not named as Defendants herein, have participated as co-conspirators with Defendants and have

14  performed acts and made statements in furtherance of the conspiracy and/or in furtherance of the

15  anticompetitive, unfair or deceptive conduct alleged herein. The allegations in this Complaint

16  apply equally to these unnamed co-conspirators.

17  29.      Whenever in this Complaint reference is made to any act, deed or transaction of

18  any corporation, the allegation means that the corporation engaged in the act, deed or transaction

19  by or through its officers, directors, agents, employees or representatives while they were

20  actively engaged in the management, direction, control or transaction of the corporation's

21  business or affairs.

22  30.      Each of the Defendants named herein acted as the agent or joint venturer of or for

23  the other Defendants with respect to the acts, violations and common course of conduct alleged

24  herein.

25  ## INTERSTATE TRADE AND COMMERCE

26  31.      Throughout the Class Period, the Air Passenger Services purchased from

27  Defendants by Plaintiffs and the other Class members created a continuous and uninterrupted

28  flow of transactions between Air Passenger Carriers and Airline Customers for air travel within,

7
**CLASS ACTION COMPLAINT**

to, and from the United States, including this District. Defendants' unlawful conduct took place within the flow of interstate commerce and affected Airline Customers located throughout the United States, including this District, as well as throughout the world. Defendants' unlawful conduct had a direct, substantial, and reasonably foreseeable effect in restraint of trade on both interstate and international commerce.

## CLASS ACTION ALLEGATIONS

32.    Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following class:

> All persons and/or entities that purchased Air Passenger Services containing at least one transpacific flight segment to or from the United States from one or more of the Defendants, any other co-conspirators, or any present or former parent, subsidiary or affiliate of Defendants, at any time during the period from no later than January 1, 2004 to the present. Excluded from the Class are Defendants, their co-conspirators, all present or former parents, predecessors, subsidiaries or affiliates of Defendants, and all governmental entities.

33.    This action has been brought and may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

a.    The Class is ascertainable and there is a well-defined community of interest among members of the Class;

b.    Based upon the nature of trade and commerce involved and the number of purchasers of Air Passenger Services from Defendants and their co-conspirators, Plaintiffs believe that the members of the Class number in the thousands, and therefore are sufficiently numerous that joinder of all Class members is not practicable;

c.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs purchased Air Passenger Services from Defendants or their co-conspirators, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class;

d.    The following common questions of law or fact, among others, exist as to the members of the Class:

1          i.    Whether Defendants formed and operated a combination or

2   conspiracy to fix, raise, maintain, and/or stabilize the prices of, or allocate the market for, Air

3   Passenger Services containing transpacific flight segments to and from the United States during

4   the Class Period;

5          ii.    Whether the combination or conspiracy caused prices for Air

6   Passenger Services to be higher than they would have been in the absence of Defendants'

7   conduct;

8          iii.    The operative time period of Defendants' combination or

9   conspiracy;

10          iv.    Whether Defendants' conduct caused injury to the business or

11   property of Plaintiffs and the members of the Class;

12          v.    The appropriate measure of the amount of damages suffered by

13   the Class;

14          vi.    Whether Defendants' conduct violates Section 1 of the Sherman

15   Act;

16          vii.    Whether Defendants took steps to actively conceal their

17   conspiracy; and

18          viii.    The appropriate nature of class-wide equitable relief.

19          e.    These and other questions of law and fact common to the members of the

20   Class predominate over any questions affecting only individual members, including legal and

21   factual issues relating to liability and damages;

22          f.    After determination of the predominant common issues identified above,

23   if necessary or appropriate, the Class can be divided into logical and manageable subclasses;

24          g.    Plaintiffs will fairly and adequately protect the interests of the Class in

25   that Plaintiffs have no interests that are antagonistic to other members of the Class and have

26   retained counsel competent and experienced in the prosecution of class actions and antitrust

27   litigation to represent them and the Class;

28

**9**
**CLASS ACTION COMPLAINT**

1          h.      A class action is superior to other available methods for the fair and

2    efficient adjudication of this litigation since individual joinder of all damaged Class members is

3    impractical. The damages suffered by the individual Class members are relatively small, given

4    the expense and burden of individual prosecution of the claims asserted in this litigation. Thus,

5    absent the availability of class action procedures it would not be feasible for Class members to

6    redress the wrongs done to them. Even if the Class members could afford individual litigation,

7    the court system could not. Further, individual litigation presents the potential for inconsistent or

8    contradictory judgments and would greatly magnify the delay and expense to all parties and the

9    court system. Therefore, the class action device presents far fewer case management difficulties

10   and will provide the benefits of unitary adjudication, economy of scale and comprehensive

11   supervision in a single court;

12         i.      Defendants have acted, and/or refused to act, on grounds generally

13   applicable to the Class, thereby making appropriate final injunctive relief with respect to the

14   Class as a whole; and

15         j.      In the absence of a class action, Defendants would be unjustly enriched

16   because they would be able to retain the benefits and fruits of its wrongful conduct.

## BACKGROUND

18   34.    Throughout the period covered by this Complaint, Defendants and their co-

19   conspirators engaged in the business of marketing and selling Air Passenger Services containing

20   transpacific flight segments to and from the United States.

21   35.    Each Defendant possesses significant market share on their routes of travel. The

22   principal competitors for the Defendants in the transpacific long haul passenger air

23   transportation market are therefore each other.

24   36.    Air Passenger Services are a commodity that can be provided by any one air

25   passenger carrier, and can be readily substitutable for any other air passenger carrier.

26   37.    Air Passenger Services are homogenous services sold by airlines, including

27   Defendants, to Airline Customers such as Plaintiffs and the members of the Class, primarily

28   based on price.

38.    The Air Passenger Services market in the United States and worldwide is highly concentrated, and substantial barriers to entry exist. Both factors facilitate the implementation and maintenance of a horizontal price-fixing cartel such as this conspiracy perpetrated by Defendants.

39.    The international airline industry is characterized by what has been called "hub and spoke operations." A hub is an airport that an airline strategically designates as a transfer point to get passengers to destinations that are not served by direct flights. The hub and spoke system enables airlines to serve many more markets than they could with the same size fleet if they offered only direct, point-to-point service. The use of hub airports is efficient because it allows airlines to concentrate its human and technical resources in a few locations. Many airlines locate their hubs at airports in the cities of their head office.

40.    There are preferential arrangements between hub-dominated airlines and their hub airports. Most hub airports will support only one or two airlines, thereby insulating those airlines from competition and giving them a substantial amount of monopoly power.

41.    The airlines' market power is further bolstered for transpacific routes because unlike short domestic flight routes, there are no reasonable alternatives to air travel. In addition, there is less competition from low-fare airlines in the international air travel market.

42.    Profitability in the airline industry has always been quite low, generally ranging from 2 to 3 percent net profit after interest and taxes, even in good years. Historically, airlines have survived largely through state support, either in the form of equity or subsidies.

43.    Full service airlines such as Defendants, have a high level of operating costs, including labor, fuel, aircrafts, spare parts, information technology networks and services, airport equipment, airport handling services, sales distribution, catering, training, and aviation insurance.

44.    In the past, airlines have attributed anywhere from 10 to 20 percent of their operating costs to jet fuel. Fuel costs vary considerably among airlines due to a number of unique factors. These factors include variable currency rates, the efficiency of the aircrafts, air route designs, air traffic control, and the individual airline's conservation efforts.

45. Fuel costs also vary among airlines because of the use of hedging, an investment strategy that locks in future fuel costs at a certain price. Different airlines hedge their fuel costs to different degrees. For example, in 2005, Thai Air hedged 31 percent of its annual fuel needs. In 2006, Qantas hedged 70 percent of its 2007 fuel costs. Air New Zealand has hedged 62 percent of its 2007 estimated fuel use.

46. During the class period, Defendants herein have imposed fuel surcharges in addition to base fares for passenger air travel. Airlines advertise fares without including taxes, charges and additional fees. In this regard, the true cost of passenger air transportation services is not readily apparent to travelers.

47. The fares for passenger air service, although not readily available to travelers for comparison, are available to the airlines. For example, ATPCO is a company that collects and distributes, for a fee, airline fares and fare-related data to the industry. The free flow of this type of information within the industry has allowed defendants to monitor their conspiracy and verify that it is working.

## DEFENDANTS' FUEL SURCHARGES

48. Generally, surcharges are a feature of the global air transportation market by which airlines negotiate to charge extra fees to their customers, above and beyond basic flight rate charges, with the intent of defraying certain costs of the carriers.

49. Beginning no later than January 1, 2004, Defendants agreed to act in concert with one another in demanding Fuel Surcharges to defray fuel costs and agreeing when and how much to increase the surcharges to their Airline Customers.

50. Defendants were aware that their imposition of Fuel Surcharges and other surcharges would not be successful if their supposed competitors did not join them; otherwise, customers would be free to seek out lower prices. For this reason, Defendants entered into agreements to raise Fuel Surcharges at the same times and in the same amounts.

51. Defendants implemented their agreement to fix, raise, maintain and/or stabilize Fuel Surcharges by publicly announcing previously agreed-upon increases, and by exchanging information in secret, including the total ticket prices to Airline Customers for Airline Passenger

1  Services, for the purpose of monitoring and enforcing the previously agreed-upon Fuel

2  Surcharges levels.

3  52.    Due to Defendants' concerted action, prices of Fuel Surcharges were fixed,

4  raised, maintained and/or stabilized at artificial and supra-competitive levels throughout the

5  Class Period.

6  53.    Examples of Defendants' lockstep increases in Fuel Surcharges include, but are

7  not limited to, the following:

8          a.    On May 11, 2004, defendant Qantas and several other major airlines

9  announced they would begin imposing Fuel Surcharges on passenger flights. Qantas' Fuel

10  Surcharge—AU$15 for international flights—would go into effect on May 17, 2004 and would

11  be in addition to increases in passenger airfares. The very next day, Air New Zealand announced

12  that it too would begin imposing Fuel Surcharges on passenger flights. Like Qantas, Air New

13  Zealand's Fuel Surcharges of NZ$20 for international flights would go into effect on May 17,

14  2004.

15          b.    On June 7, 2004, China Air began collecting a US$7 Fuel Surcharge on

16  passenger air travel, and Singapore Air began collecting a US$5 Fuel Surcharge on its flights.

17          c.    On August 20, 2004, Qantas announced the first of several increases in its

18  Fuel Surcharge. Qantas' increased Fuel Surcharge was AU$22 for international flights. Six days

19  later, Air New Zealand announced it would raise its Fuel Surcharge as well.

20          d.    On October 20, 2004, Qantas raised Fuel Surcharges for the second time

21  in less than six months to AU$29 for international flights. Notably this increase was despite the

22  fact that Qantas' fuel costs were fully hedged through the end of the year. The announcement

23  came one day after Qantas reported a record full-year net profit of AU$648 million. Six days

24  after Qantas raised its Fuel Surcharges, Air New Zealand followed suit by raising its own Fuel

25  Surcharges for international flights.

26          e.    On November 1, 2004, EVA Air began imposing a US$17 Fuel

27  Surcharge on air travel.

28          f.    Singapore Air raised its Fuel Surcharge on November 15, 2004.

g.    On February 1, 2005, All Nippon and Japan Air both implemented, for the first time, a Fuel Surcharge of US$24 on flights between North America and Japan. The same day, Singapore Air raised its Fuel Surcharge for international flights to US$22.

h.    On March 28, 2005, Qantas raised its Fuel Surcharges on international flights to US$35. On April 6, 2005, Air New Zealand followed Qantas' lead by raising its Fuel Surcharge on long haul flights to NZ$52.

i.    Beginning May 1, 2005, Thai Air charged a US$25 Fuel Surcharge on international flights.

j.    On July 1, 2005, All Nippon and Japan Air simultaneously raised Fuel Surcharges on travel between North America and Japan.

k.    On August 1, 2005, Thai Air raised Fuel Surcharges on international flights, including those to and from the United States, to US$35. Later that month on August 16, 2005, it raised Fuel Surcharges on international flights to US$50.

l.    Air New Zealand raised Fuel Surcharges on August 22, 2005 to NZ$92 for international flights. The next day, Qantas announced it would increase its Fuel Surcharges on international flights to AU$75.

m.    On October 13, 2005, Northwest raised its Fuel Surcharge on transpacific flights to US$65.

n.    On April 21, 2006, Qantas increased its Fuel Surcharge on international travel to US$65.

o.    On May 15, 2006, China Air raised its Fuel Surcharge for travel between Taiwan and the United States to US$70—ten times the original Fuel Surcharge implemented less than two years before. On May 16, 2006, EVA Air also raised its Fuel Surcharge for travel between Singapore and the United States to US$65. On May 19, 2006, Singapore Air raised its Fuel Surcharges for international flights to US$90. By May 22, 2006, Air New Zealand and Qantas were both charging US$65 in Fuel Surcharges for international flights.

1          p.  On June 1, 2006, Thai Air raised its Fuel Surcharges on travel between

2  the United States and Bangkok to US$65, matching the Fuel Surcharges of EVA Air, Air New

3  Zealand, and Qantas.

4          q.  On July 25, 2006, Northwest raised its Fuel Surcharge for travel between

5  the United States and Singapore to $90, the same surcharge implemented by Singapore Air a

6  couple of months earlier.

7          r.  On August 24, 2006, China Air raised its Fuel Surcharge for flights to and

8  from the United States to US$95.

9          s.  On August 31, 2006, Qantas raised its Fuel Surcharges again to AU$185,

10  while keeping domestic Fuel Surcharges unchanged.

11          t.  Thai Air increased its Fuel Surcharges on international flights once again

12  on September 1, 2006. Six days later, United Airlines raised Fuel Surcharges on travel between

13  the United States and Singapore to US$90, the same surcharge that Singapore Air and

14  Northwest were charging. Notably, there was a ten percent decline in prices for crude oil in

15  September 2006, the largest decline in 21 months.

16          u.  On October 1, 2006, All Nippon and Japan Air both raised their Fuel

17  Surcharges for transpacific travel to US$113.

18          v.  On October 14, 2006, Singapore Air lowered Fuel Surcharges for travel

19  between the United States and Singapore to US$82.

20          w.  Following the lead of Singapore Air, on January 1, 2007, All Nippon and

21  Japan Air lowered Fuel Surcharges on travel between North America and Japan to US$108.

22          x.  Also in January 2007, Qantas announced that due to a 25 percent drop in

23  jet fuel prices over the preceding five months, it would reduce Fuel Surcharges on certain of its

24  flights. However, Qantas did not reduce the surcharges on any of its long haul flights, including

25  transpacific flights to or from the United States. Consistent with Qantas, Air New Zealand's

26  Fuel Surcharges on transpacific flights remained unchanged in early 2007.

27          y.  Singapore Air lowered its Fuel Surcharge on travel between the United

28  States and Singapore to US$78 on February 1, 2007.

z.    On May 1, 2007, All Nippon and Japan Air both lowered Fuel Surcharges on international flights to US$91.

aa. On July 30, 2007, Northwest raised Fuel Surcharges for travel between the United States and Singapore to US$115.

bb. On August 10, 2007, EVA Air raised its Fuel Surcharge to US$103 on transpacific flights to and from the United States.

cc. On October 1, 2007, All Nippon and Japan Air raised their Fuel Surcharges to US$108. The same day, Thai Air increased its Fuel Surcharge for travel between the United States and Thailand to US$140.

dd. By November 7, 2007, Singapore Air was charging US$104 in Fuel Surcharges for travel between the United States and Singapore.

54.    Published flight prices and surcharges for November 2007 demonstrate that Defendants' collusive pricing is continuing:

**San Francisco to Auckland**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---|---|---|---|---|
| Air New Zealand | Coach | $918 | $255 | $1173 |
| Qantas | Coach | $918 | $255 | $1173 |

**San Francisco to Bangkok**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---|---|---|---|---|
| All Nippon | Coach | $650 | $281 | $931 |
| Japan Air | Coach | $620 | $281 | $901 |

**San Francisco to Hong Kong**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---|---|---|---|---|
| All Nippon | Coach | $580 | $269 | $849 |
| Japan Air | Coach | $579 | $269 | $848 |

**San Francisco to Seoul**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| All Nippon | Coach | $620 | $296 | $916 |
| Japan Air | Coach | $620 | $289 | $909 |

**San Francisco to Sydney**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| Air New Zealand | Coach | $818 | $312 | $1130 |
| Qantas | Coach | $818 | $308 | $1126 |

**San Francisco to Taipei**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| EVA Air | Coach | $719 | $274 | $993 |
| Japan Air | Coach | $620 | $274 | $894 |
| Qantas | Coach | $1575 | $274 | $1849 |
| Singapore Air | Coach | $900 | $274 | $1174 |
| Thai Air | Coach | $1660 | $274 | $1934 |

**San Francisco to Tokyo**

| Airline | Cabin | Base Fare | Surcharges | Total |
|---------|-------|-----------|------------|-------|
| All Nippon | Coach | $529 | $270 | $799 |
| Japan Air | Coach | $529 | $270 | $799 |

**Defendants Profited From the Fuel Surcharges**

55.    Surcharges are designed to compensate for increases in certain external costs, and thus should be tied to the price of those external costs. In a competitive market, when the cost of jet fuel falls, Fuel Surcharges should fall as well.

56.    In a truly competitive market, the imposition of Fuel Surcharges by an airline that exceeds the actual cost of fuel consumed should create competition from others. Here, however, Defendants chose not to compete, and the only plausible explanation for that lack of competition is that Defendants were conspiring.

57.    As the following aggregate industry data reported by the IATA in September 2007 demonstrates, the airline industry's operating profits were already declining before there was any substantial rise in fuel costs. This data also shows that the airlines' Fuel Surcharges, which were implemented in 2004, were not a true cost recovery mechanism, but rather a camouflaged revenue generator. Consequently, the airlines' use of Fuel Surcharges has allowed them to reach levels of profitability greater than what they had when fuel prices were stable.

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007f | 2008f |
|---|---|---|---|---|---|---|---|---|---|
| Passenger Revenues in Billions | $256 | $239 | $238 | $249 | $297 | $323 | $355 | $389 | $419 |
| Expenses in Billions | $318 | $319 | $311 | $323 | $376 | $409 | $440 | $473 | $500 |
| Crude Oil Price, Brent, $/barrel | $28.8 | $24.7 | $25.1 | $28.8 | $38.8 | $54.5 | $65.1 | $67.0 | $66.0 |
| Operating Profit in Billions | $1.1 | -$4.2 | -$3.7 | -$2.3 | -$1.5 | -$1.0 | -$0.1 | $1.1 | $1.5 |

58.    The fact that Defendants profited from their increasing Fuel Surcharges is further evidenced by the record profits that Defendants have experienced since implementing the surcharges.

59.    In the first quarter of fiscal year 2006, All Nippon posted a net profit of 7.68 billion yen.

60.    Thai Air posted a profit in the third quarter of 2006, during which it collected nearly US$80 million in Fuel Surcharges. An August 10, 2006 article in *The China Post* quoted a securities analyst as saying that, "[t]he higher fuel surcharge in place was quite effective" in raising Thai Air's revenues.

1    61.    In the 12 months ending June 30, 2007, Qantas saw a 49.9 percent increase in net

2    profit. The *Sydney Morning Herald* has reported that each AU$1 of Qantas' Fuel Surcharge on

3    international flights translates into AU$10 million in annual revenue.

4    62.    On August 7, 2007, *The Japan Times* reported that Japan Air's operating loss

5    shrank from 31.9 billion yen the prior year to 8.5 billion yen. The article further stated,

6    "Yoshimasa Kanayama, [Japan Air] executive officer, attributed the improved earnings

7    performance to the carriers' efforts to cut costs, brisk business demand for international flights,

8    higher revenue per passenger achieved through fare hikes on domestic routes and *increased fuel*

9    *surcharges on international flights.*" [Emphasis added]

10    63.    On August 28, 2007, Air New Zealand announced its net profit after tax was

11    NZ$214 million, up 123 percent from the previous year. Notably, operating revenue increased

12    13 percent, while the number of passengers carried only increased 4.9 percent.

13    64.    The IATA has reported that whereas in 2002, airlines needed an oil price of less

14    than US$20 a barrel to break even, they are profitable in 2007 with nearly US$70 a barrel.

15    65.    Through a dominant combined market share, a number of cooperative

16    agreements to share ticket services and carry passengers for one another, and a number of

17    methods by which they shared real time information on prices, Defendants controlled a vast

18    majority of airline travel between the United States and the Asia/Pacific region during the Class

19    Period and were able to fix, raise, maintain and/or stabilize Fuel Surcharges and reap enormous

20    profits from these Fuel Surcharges paid by Plaintiffs and the members of the Class.

21    **Cartel-Like Trade Organizations Facilitated Defendants' Conspiracy**

22    66.    Defendants' executives, as well as other air carriers' executives, met formally or

23    informally during the Class Period at various trade meetings or meetings of trade associations,

24    such as the International Air Transportation Association ("IATA"), the Association of Asian

25    Pacific Airlines ("AAPA"), Oneworld, Star Alliance, and Sky Team Alliance. At one or more of

26    these meetings Defendants conspired to artificially inflate Fuel Surcharges on international air

27    transportation.

28

1    67.    The AAPA was a key player in the success of this conspiracy. The 17-member
2    trade association, based in Kuala Lumpur, Malaysia, is the most significant group representing
3    Asia/Pacific carriers. The AAPA boasts that its "member airlines carry 285 million passengers
4    and 10 million tonnes of cargo representing approximately one-fifth of global passenger traffic
5    and one-third of global air cargo traffic respectively." Defendants Air New Zealand, All Nippon,
6    EVA Air, China Air, Japan Air, Singapore Air, Qantas and Thai Air are all members of the
7    AAPA.

8    68.    Each of the Defendants is a member of the IATA, which describes itself as "the
9    prime vehicle for inter-airline cooperation in promoting safe, reliable, secure and economical air
10    services...." The IATA collects and publishes industry intelligence and statistics, including
11    routes, analysis of operating and net margins, fuel consumption and unit fuel price paid, traffic
12    figures, and distribution of operating costs. Additionally, the IATA hosts multiple events each
13    year for its members, which provide an opportunity for airline executives to socialize,
14    collaborate and collude.

15    69.    Examples of meeting where executives discussed and agreed upon fuel
16    surcharges are as follows:

17          a.    IATA, Special Meeting, Geneva, May 28, 2004: fuel costs were the main
18    topic of this meeting and there were agreements on how to add surcharges for fuel. The
19    Montreal Gazette reported on June 1, 2004, that "member carriers of the International Air
20    Transport Association might raise international fares by as much as 5 percent to help cover a
21    surge in jet fuel costs. The proposed fare increase of between two and five percent was agreed at
22    a May 28 meeting of the association, which represents more than 270 airlines worldwide, an
23    IATA spokesman said."

24          b.    IATA Annual General Meeting and World Air Transport Summit,
25    Singapore. June 6-8, 2004: more than 600 airline executives attended this annual summit.
26    Giovanni Bisignani, IATA CEO said in a welcoming statement, "While record high fuel prices
27    challenge our profitability it is time to put our efforts toward rebuilding the industry."
28    Immediately following this meeting on June 8, 2004, both Japan Air and All Nippon filed

**20**
**CLASS ACTION COMPLAINT**

applications with the Japanese government to raise Fuel Surcharges on international fares. In a news release announcing the Fuel Surcharge hike, a representative for Japan Air said:

> "The application follows a special meeting of the members of the International Air Transportation Association in Geneva, May 28 [2004] when a resolution was discussed to raise fares in the wake of increased fuel prices. This resolution has now been adopted."

Japan Air and All Nippon were in lockstep on June 8, 2004, both announcing on that day a five percent Fuel Surcharge would go into effect on the same day, July 1, 2004.

          c.  2005 International Flight Services Association, Global Leadership Conference – Asia/Pacific, August 30 – September 1, 2005, Tokyo, Japan: this meeting was labeled "The Challenge of Change." Among the participants were executives from Japan Air, Continental Airlines, Cathay Pacific Airways, Thai Air, Northwest Airlines, and Asiana Airlines.

          d.  2nd Annual Asia Pacific & Middle East Aviation Outlook Summit 2006, December 5-6, 2005 Kuala Lumpur, Malaysia: the theme of this meeting was "Towards Best Practice; Maximising Revenues and Minimising Costs." Attendees included Dato Seri Bashir Ahmad, Malaysia Airport CEO; Willy Boulter, Commercial Director for Virgin Atlantic Airways; and Stanley Kuppusamy, President, International Relations, Singapore Airlines. Fuel Surcharges were a topic of discussion.

          e.  Aviation Emergency Response 2006, AAPA sponsored, September 19-21, 2006, Bangkok, Thailand: this meeting was attended by international airport officials and AAPA executives. Meetings were held on increasing revenues in the transpacific area by way of Fuel Surcharges and other financial means.

          f.  3rd Annual Asia Pacific & Middle East Aviation Outlook Summit 2006, November 9-10, 2006, Singapore: executives from most of the Defendants participated in this meeting, including Geoff Dixon, CEO of Qantas and Huang Cheng Eng, Executive VP for Singapore Airlines. One of the issues presented and discussed was "*Fighting Costs: Fuel prices and managing risk exposure.*"

1        g.  AAPA Forum, November 28-29, 2006, Bandar Seri Begawan, Brunei

2  Darussalam: more than 120 aviation industry stakeholders attended this meeting, organized by

3  AAPA. At this meeting, Defendants and others discussed Fuel Surcharges.

4        h.  Asia Pacific Aviation Summit, July 24-25, 2007, Sydney, Australia: this

5  meeting was arranged by the Asia Pacific aviation industry. Some of the issues discussed

6  included the impact of the investigation by the U.S. Department of Justice into fare price fixing.

7  Another topic was "working together efficiently" to diffuse the investigation of added

8  surcharges.

9      70.   Alliance memberships by airlines are as follows:

10        a.   Air New Zealand: member of AAPA, Star Alliance and IATA.

11        b.  All Nippon: member of AAPA, Star Alliance and IATA.

12        c.   American Airlines: member of Oneworld and IATA.

13        d.  Cathay Pacific Airways: member of AAPA, Oneworld and IATA.

14        e.   China Airlines: member of AAPA and IATA.

15        f.   EVA Airlines: member of AAPA and IATA.

16        g.   Japan Air: member of AAPA, Oneworld and IATA.

17        h.  Malaysia Airlines: member of AAPA and IATA.

18        i.   Northwest Airlines: member of Sky Team Alliance and IATA.

19        j.   Qantas Airways: member of AAPA, Oneworld and IATA.

20        k.  Singapore Air: member of AAPA, Star Alliance and IATA.

21        l.   Thai Airways: member of AAPA, Star Alliance and IATA.

22        m. United Airlines: member of Star Alliance and IATA.

23  **Code Sharing Business Partnerships**

24      71.   In addition to the four different alliances/trade groups, various Defendants are in

25  effect business partners with each other through what is called "code sharing." Code sharing is a

26  business term which first originated in 1990 when Qantas and American Airlines combined

27  services between an array of U.S. and Australian cities. Code sharing is a legal business

28  arrangement. However, it also provides a mechanism to conduct illegal activity.

72.     A code share is part of a "cooperative services" agreement between two carriers. It refers to the practice where a flight operated by an airline is jointly marketed as a flight for one or more other airlines. Most major airlines today have code sharing partnerships with other airlines. "Code" refers to the identifier used in the flight schedule, generally the 2-character International Air Transport Association airline designator code and flight number. For example, YY123, flight 123 operated by the airline YY, could be sold by airline ZZ as ZZ456. It is a business partnership that allows airlines to earn revenue by selling tickets on a partner's flight.

**The Investigations**

73.     The U.S. Department of Justice ("DOJ") began investigating air passenger fuel surcharge conspiracies worldwide in 2006, particularly transatlantic routes to and from the West Coast. When the DOJ announced a \$300 million settlement with British Airways on August 1, 2007, it cited passenger transatlantic routes. In its news release, the DOJ said: "The Department also charged that between August 2004 and February 2006, British Airways engaged in a conspiracy to suppress and eliminate competition by fixing the Fuel Surcharge charged to passengers on long-haul international flights, including flights between the United States and the United Kingdom."

74.     The DOJ also focused on transpacific flights to and from the United States, noting that their investigation is "ongoing" and includes other Defendants named herein.

75.     The DOJ announced a settlement with Korean Air for fare price fixing on flights from the United States and Korea. The DOJ stated that Korean Air has "agreed to cooperate with the Department's ongoing investigation." Korean Air's unnamed co-conspirator in the passenger fare price fixing via Fuel Surcharges was widely reported to be Asiana Airlines, which sought amnesty.

76.     Both Korean Air and Asiana Airlines are among the top transpacific carriers in the world. It was not the first time Korean Air and Asiana Airlines have been implicated in collusion and anticompetitive behavior. The Korean Fair Trade Commission fined Korean Air and Asiana Airlines in 2001 for conspiring to set passenger air transportation services in Korea.

77.    In addition, several of the Defendants and unnamed co-conspirators have been identified as targets and or subjects in international investigations by the U.S. Department of Justice and the European Union into air cargo Fuel Surcharge price fixing. The targets, many of which are also named in civil suits include Defendant All Nippon, American Airlines, Asiana Airlines, Defendant Japan Airlines, Korean Airlines, Defendant Northwest Airlines, Defendant Qantas Airways, and Defendant United Airlines. In both the air passenger and cargo investigations, Defendants and other airlines are accused of developing and participating in conspiracies to increase revenue by assessing inflated Fuel Surcharges.

## Admissions By Co-Conspirators

78.    On August 13, 2007, Qantas Chief Executive Officer Geoff Dixon announced that Qantas Airways would set aside $40 million to cover a potential fine in the United States as a result of Fuel Surcharges in its freight division. In a news release, Dixon was quoted as saying:

> "On August 1, 2007, the U.S. Department of Justice announced that British Airways and Korean Air had agreed to plead guilty and pay separate US$300 million criminal fines for their roles in conspiracies to fix prices of passenger and cargo flights. British Airways subsequently announced that US$200 million of its fine related to cargo. Based on these developments, a decision has been made to make a US$40 million (A$47 million) provision in the 2006/7 Financial Accounts."

Dixon was also quoted as saying:

> "We have investigated this issue thoroughly and are confident that the unacceptable conduct was limited to a small number of people."

79.    On October 6, 2007, the Japanese daily newspaper *Asahi Shimbun* reported that Japan Airlines International would book roughly a $171 million charge for potential fines from a global price fixing probe by U.S. and European Union officials. The newspaper said:

> "The company's move comes after the U.S. Justice Department fined British Airways plc and Korean Air Lines Co. $300 million each in August for fixing prices of passenger and cargo flights with other airlines. The companies allegedly conspired to set fuel surcharges when oil prices rose."

//

//

**24**
**CLASS ACTION COMPLAINT**

1

## VIOLATIONS ALLEGED

2

### First Claim for Relief

3

### (Violation of Section 1 of the Sherman Act)

4      80.      Plaintiffs incorporate and reallege, as though fully set forth herein, each and

5   every allegation set forth in the preceding paragraphs of this Complaint.

6      81.      Beginning at a time unknown to Plaintiffs, but no later than January 1, 2004, and

7   continuing through the present, Defendants and their co-conspirators entered into a continuing

8   agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain

9   and/or stabilize the amount of Fuel Surcharges paid by Plaintiffs and the other Class Members,

10  ostensibly to defray increased fuel costs, in violation of Section 1 of the Sherman Act, 15 U.S.C.

11  §1.

12     82.      In formulating and carrying out the alleged agreement, understanding, and

13  conspiracy, the Defendants and their co-conspirators did those things that they combined and

14  conspired to do, including, but not limited to the acts, practices, and course of conduct set forth

15  above, and the following, among others:

16          a.      Agreed to fix, raise, maintain and stabilize the price of Air Passenger

17                  Services and Fuel Surcharges charged in the United States and throughout

18                  the world;

19          b.      Implemented Fuel Surcharge increases and decreases in the same or

20                  similar amounts;

21          c.      Announced Fuel Surcharge increases and decreases at or near the same

22                  times;

23          d.      Implemented Fuel Surcharge increases and decreases at or near the same

24                  times;

25          e.      Participated in meetings, phone conferences and other communications to

26                  exchange information used by Defendants to formulate and implement the

27                  Fuel Surcharges; and

28

**25**
**CLASS ACTION COMPLAINT**

1

2

f.       Signaled and communicated the formulation and implementation of the
         Fuel Surcharges.

3    83.    During the Class Period, the Defendants increased, as a ratio to external costs—
4 and profits—the Air Passenger Services and Fuel Surcharges they charged. These increases in
5 Air Passenger Services and Fuel Surcharges cannot be explained by actual increases in fuel
6 prices or supply/demand forces, but rather were the result of anticompetitive conduct.

7    84.    The illegal combination and conspiracy alleged herein has had the following
8 effects, among others:

9
10

a.       Price competition in the contracting of Air Passenger Services has been
         restrained, suppressed and/or eliminated;

11
12
13

b.       Air Passenger Services and Fuel Surcharges assessed thereon by
         Defendants and their co-conspirators have been fixed, raised, maintained
         and stabilized at artificially high, non-competitive levels; and

14
15

c.       Those who purchased Air Passenger Services and paid Fuel Surcharges
         have been deprived the benefits of free and open competition.

16    85.    During the Class Period, Plaintiffs and members of the Class purchased Air
17 Passenger Services from one or more Defendants and their co-conspirators.

18    86.    As a direct and proximate result of Defendants' illegal contract, combination and
19 conspiracy, Plaintiffs have been injured and will continue to be injured in their business and
20 property by paying more for Fuel Surcharges assessed by the Defendants and their co-
21 conspirators than they would have paid and will pay in the absence of the combination and
22 conspiracy.

23    87.    Plaintiffs and the members of the Class request three times their actual damages
24 that resulted from Defendants' illegal conspiracy to fix Fuel Surcharges on Air Passenger
25 Services. The total amount of damages is presently undetermined.

26    88.    Plaintiffs and the Class are entitled to an injunction against Defendants,
27 preventing and restraining the violations alleged herein.

28    //

**26**
**CLASS ACTION COMPLAINT**

**FRAUDULENT CONCEALMENT**

89. Throughout the relevant period, Defendants affirmatively and fraudulently concealed their unlawful conduct against Plaintiffs and the Class.

90. Plaintiffs and the members of the Class did not discover, and could not discover through the exercise of reasonable diligence, that Defendants were violating the antitrust laws as alleged herein until the governmental investigations of their actions were first announced. Nor could Plaintiff and the members of the Class have discovered the violations earlier than that time because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection. The conspiracy was by its nature self-concealing.

91. Defendants engaged in a successful price-fixing conspiracy with respect to Air Passenger Services and Fuel Surcharges, which they affirmatively concealed, in at least the following respects:

a. By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme; and

b. By giving false and pretextual reasons for their Fuel Surcharge increases during the relevant period and by describing such increases falsely as being the result of external costs, namely the rising cost of jet fuel, rather than collusion.

92. As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiffs and the Class assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiffs and the members of the Class.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray as follows:

A. That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

1    B.    That the Court adjudge and decree that the unlawful conduct, contract,

2    combination and conspiracy alleged herein constitutes a *per se* unreasonable restraint of trade in

3    violation of Section 1 of the Sherman Act, 15 U.S.C. §1 and Sections 4 and 26 of the Clayton

4    Act;

5    C.    That judgment be entered against Defendants, jointly and severally, and in favor

6    of Plaintiffs and the Class they represent for damages as allowed by the Sherman Act, as

7    determined to have been sustained by them, together with costs of suit, including reasonable

8    attorneys' fees;

9    D.    That Defendants, their co-conspirators, successors, transferees, assigns, parents,

10    subsidiaries, affiliates, and the officers, directors, partners, agents and employees thereof, and all

11    other persons acting or claiming to act on behalf of Defendants, or in concert with them, be

12    permanently enjoined and restrained from, in any manner, directly or indirectly, continuing,

13    maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of

14    action, or adopting or following any practice, plan, program or design having a similar purpose

15    or effect in restraining competition;

16    E.    That the Court award Plaintiffs and the Class they represent attorneys' fees and

17    costs, and pre-judgment and post-judgment interest as permitted by law; and

18    F.    That the Court award Plaintiffs and the Class they represent such other and

19    further relief as may be necessary and appropriate.

20    ## JURY DEMAND

21    Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

22

23    Dated: December 19, 2007    By:    _Maria N. Alioto_

24    Mario N. Alioto (56433)
Lauren C. Russell (241151)

25    TRUMP, ALIOTO, TRUMP & PRESCOTT
2280 Union Street

26    San Francisco, CA 94123
Telephone: (415) 563-7200

27    Facsimile: (415) 346-0679
E-mail: malioto@tatp.com ;

28    laurenrussell@tatp.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Sherman Kassof (66383)
Law Offices of Sherman Kassof
555 12th Street, Suite 1900
Oakland, CA 94607
Telephone: (510) 652 2554
Facsimile: (510) 652 9308
Email: heevay@att.net

Joseph M. Patane (72202)
LAW OFFICES OF JOSEPH M. PATANE
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 563-7200
Facsimile: (415) 346-0679
E-mail: jpatane@tatp.com

Attorneys for Plaintiffs Kaufman, Mitchell, Senger
and Schenck And All Others Similarly Situated